## Case No. 5,392.

### GIBSON v. CINCINNATI ENQUIRER.

[2 Flip. 121;[1] 5 Cent. Law J. 380; 23 Int. Rev. Rec. 392; 2 Cin. Law Bul. 244.]

Circuit Court, S. D. Ohio. Oct. 15, 1877.

NEWSPAPER ARTICLE—LIBEL—ADMISSIBILITY IN EVIDENCE OF OTHER ARTICLES.

1. Libellous publications from the same paper and relating to other parties, may be put in evidence, in an action for libel, in order to prove that the paper showed a want of care in guarding its columns against the insertion of such articles. If such or similar articles were frequent it would be a ground for increasing the damages, as it would show a recklessness of conduct.

[Cited in Post Pub. Co. v. Hallam, 8 C. C. A. 204, 59 Fed. 534.]

2. The words "crim. con." and "flagrante delicto" defined.

[Cited in State v. Baldwin (Kan.) 12 Pac. 329.]

3. A verdict for $3,875 against a newspaper, having a large circulation, for libel in charging plaintiff with adultery, is not excessive.

This was action for publishing in the Cincinnati Enquirer, a paper of large circulation and influence, the following libel:

"Still Another.—The new city of Huntington, up the river, is now enjoying one of the juiciest crim. con. scandals of the day. The parties are one Gibson, a Republican editor, and the wife of a railroad official at Huntington, West Virginia, who were caught in flagrante delicto on the steamer Bostonia, and hustled ashore at midnight by Captain Bryson."

Evidence showed that plaintiff was a person of good reputation, having a wife and children; that he was engaged in publishing a newspaper in Huntington, which had a circulation in several states; that defendant's paper had a daily circulation of 15,000 or thereabout, and 300 within limits of plaintiff's paper. The defendant gave evidence tending to show that the article was not published maliciously; that it was taken from a printed slip received in an envelope from Hunting-

ton, West Virginia, without any name or address; that he had no knowledge of the plaintiff, and that a correction was published in the Enquirer. The jury returned a verdict for the plaintiff, fixing his damages at $3,875. Defendant moved for a new trial upon the several grounds stated in the opinion.

T. D. Lincoln, for plaintiff.
Hoadly, Johnson & Colston, for defendant.

BROWN, District Judge. The first error assigned is in the admission of the article immediately preceding the libel in question, and in permitting the same to be read to the jury. I am informed by the learned judge who presided at the trial, that in fact only the caption of the article was read to the jury as explanatory of the words "Still Another"; but it is claimed that even this was erroneous, unless the words "Still Another" were aided or explained by an innuendo, referring to the preceding article, which was entitled, "Terrible Charge against a Methodist Preacher." I think the defendant has mistaken the province of an innuendo. There is here no ambiguity of language of which it is the function of the innuendo to point out the meaning, but a mere reference to something which evidently preceded the libel in question, and to which it was not an error to direct the attention of the jury.

But I am inclined to think the entire article, which was also libellous in its nature, was admissible as bearing upon the question of damages. While it is doubtless true that the commission of one grave offense cannot be proven by evidence of another offense committed at a different time and place, there is a class of cases holding that where the knowledge or intent of the party is in issue, evidence of other acts of a similar nature, done at or about the same time, is competent evidence of his method of doing business; for instance, in prosecutions for passing counterfeit money, evidence that the prisoner made efforts to pass counterfeit money upon other persons than those set forth in the indictment is always competent as bearing upon the question of scienter. Whart. Cr. Law, § 1457; 1 Phil. Ev. 768, 769. So also in prosecutions for frauds upon the revenue, evidence that the party has committed other frauds of a similar character is constantly admitted as bearing upon the question of intent. Allison v. Matthieu, 3 Johns. 235; Hennequin v. Naylor, 24 N. Y. 139; 1 Phil. Ev. 750, 753, 758, 759. So also in action against a railroad company for damages occasioned by fire from locomotives, evidence that other locomotives belonging to the same road were in the habit of throwing sparks beyond where the fire took place is competent as showing the general character of the equipment used by the road. Sheldon v. Hudson River R. Co., 4 Kern. [14 N. Y.] 220; Pittsburgh, Ft. W. & C. R. Co. v. Ruby, 38 Ind. 311, 312; Aldridge v. Great Western Ry. Co., 3 Man. & G. 515; Field v.

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

New York Cent. & H. R. R. Co., 32 N. Y. 339. The same rule has also been applied in actions for libel, and evidence of other articles of a libellous nature, has been held competent as showing a want of care in guarding the columns of the paper against the insertion of such articles. Pearson v. Lemaitre, 5 Man. & G. 700; Chubb v. Westley, 6 Car. & P. 436.

In the case of Detroit Daily Post & Tribune Co. v. McArthur, 16 Mich. 454, the court observe: "The employment of competent editors, the supervision by proper persons of all that is to be inserted, and the establishment and habitual enforcement of such rules as would probably exclude improper items, would reduce the blameworthiness of the publisher to a minimum, for any libel inserted without his privity or approval, and should confine his liability to such damages as include no redress for wounded feeling, beyond what is inevitable from the nature of the libel. * * * If, on the other hand, it should appear, from the frequent recurrence of similar libels, or from other proof tending to show a want of solicitude for the proper conduct of his paper, that the publisher was reckless of consequences, then he would be liable to increased damages, simply because by his own fault he had deserved them. By such recklessness he encouraged fault or carelessness in his agents, and becomes in a manner in complicity with their misconduct." This rule has very recently been affirmed by the same court in the case of Scripps v. Reilly [35 Mich. 371]. In this case it was also claimed that the court erred in admitting certain publications relating to other parties. It was made a question whether the paper was conducted with sufficient care to save the plaintiff in error from punitory damages, in case the jury should find the article libellous, and no actual malice. "If such mode of proof was proper, these articles tended to show the want of such care." The McArthur Case is here cited as plainly imputing the right to show the recurrence of similar libels, and implying distinctly that particular instances may be adduced to make out the fact of general recklessness in the conduct of the paper.

In the charge to the jury in this case the learned judge laid the exemplary damages before them in the following words: "So that before you can go beyond the general damages indicated by the pleadings in the case, and give exemplary damages, you must find either that it was willful, or that there was that active want of care which would raise the presumption of conscious indifference, not gross negligence, but a conscious indifference to the rights of the plaintiff." In this view of the case it seems to me that no error should be predicated upon the admission of this article.

Secondly. It is claimed that the court erred in defining to the jury the meaning of the abbreviation "crim. con." There is nothing in this objection. Courts take judicial notice of the meaning of words and idioms in the vernacular of the language (1 Greenl. Ev. § 5), and no colloquium or innuendo is necessary to point out their meaning. Where the meaning of the words is well settled by common usage, there is no use of calling persons to testify as to what was meant by them at the time they were uttered, or to explain their meaning if published in a newspaper. The words "crim. con." are usually understood as an abbreviation for "criminal conversation," and these words have of themselves acquired a fixed and universal significance.

Third. Equally unobjectionable was the translation by the court of the words "flagrante delicto." While a libel published in a foreign language would, ordinarily, be interpreted by witnesses skilled in the knowledge of both languages, there is a class of foreign words that have been so far anglicized by common use as to have become, substantially, a part of the language. Instances of these are "habeas corpus," "bona fide," "prima facie," "a fortiori," from Latin, and a large number from the French and other modern languages. Wherever such words occur, it is clearly within the province of the court to define them to the jury. Townsh. Sland. & L. 160, note 2; Homer v. Taunton, 5 Hurl. & N. 661, 667; Barnett v. Allen, 3 Hurl. & N. 376; Hoare v. Silverlock, 12 Adol. & El. (N. S.) 624. It is only where the words are ambiguous, obscure, or used in a local or technical sense that an innuendo is necessary. Indeed, if the whole libel had been published in a foreign language, and the court had assumed to translate and define its meaning to the jury without the aid of experts, it is difficult to see how this error could be made the ground for a new trial. It is only error that prejudices which justifies setting aside the verdict; and if the translation is in fact correct, it is difficult to see wherein the prejudicial error lies. Certainly the definition given by the learned judge of the words "in flagrante delicto," if any definition were necessary to an ordinarily intelligent jury, was undoubtedly correct. There is no ground here for a new trial.

Fourth. It was insisted with great earnestness, that the court should set aside the verdict upon the ground of excessive damages. Nothing is more difficult than to determine in an action of tort, for injury to person or reputation, what damages are excessive. In actions upon contract they can, ordinarily, be computed with some degree of certainty. Frequently they are the subjects of mere mathematical calculation. In such cases a slight excess might justify the court, if not in setting aside the verdict, at least in making the refusal of a new trial conditioned upon a reduction; but in actions of tort an exact computation is not only impossible, but there is frequently an entire absence of data from which the amount of damages can be approximately estimated,

and especially is this so in regard to injuries to person or to reputation. In actions for libel so much depends upon the relative situation of the parties, the character of the language used, and the amount of publicity given to the libel, that it is scarcely too much to say there is no rule beyond the discretion of the jury. I find the law upon this subject thus stated in Townshend on Libel (section 293): "As the amount of damages in an action for slander or libel is always a subject for the exercise of the sound discretion of the jury, who may give more or less, according to their conclusions from the whole case respecting the motives of the publisher, a verdict in such an action will not be set aside for excessive damages, unless there is some suspicion of unfair dealing, or unless the case be such as to furnish evidence of prejudice, partiality or corruption on the part of the jury. The case must be very gross and the damages erroneous to justify a new trial on the question of damages." A few instances where applications have been refused, will show the general reluctance of courts to set aside verdicts in actions of this kind upon the ground of excessive damages. In McDougal v. Sharp, First City H. Rec. 73, the charge was perjury, and the verdict $3,500, which the court refused to disturb. In Tillotson v. Cheetham, 2 Johns. 63, the court refused to set aside a verdict for $1,400 for accusing the plaintiff of political corruption: "A case must be very gross and the recovery enormous to justify our interposition on a mere question of damages in an action for slander." In Ryckman v. Parkins, 9 Wend. 470, a verdict in slander of $7,000 was sustained. In Trumbull v. Gibbons, Jud. Repos. (N. Y.) 1, a verdict of $15,000, and in Fry v. Bennett, 4 Duer, 247, one of $10,000 for publishing charges against the plaintiff as manager of an opera company were also held insufficient to justify the interference of the court. In Duberley v. Gunning, 4 Term R. 651, the court refused to disturb a verdict of £5,000 in an action for criminal conversation, and in Coffin v. Coffin, 4 Mass. 1, the court sustained a verdict of $2,500 for slander spoken in the house of representatives. The case was tried in 1808, when the purchasing value of $2,500 was at least twice what it is to-day. In Letton v. Young, 2 Metc. [Ky.] 558, the supreme court of Kentucky refused to set aside a verdict of $4,000 in an action of slander.

The cases of this character, in which the courts have granted new trials upon this ground are not only very rare, but will always be found to be accompanied by strongly mitigating circumstances. In Nettles v. Harrison, 2 McCord, 230, the defendant said of the plaintiff that he kept a house of prostitution; verdict $5,000. A new trial was granted, as the words were uttered but once, and were induced by plaintiff encouraging defendant's son to visit his house. having daughters of none the best characters, with whom his son had been too intimate. In Freeman v. Tinsley, 50 Ill. 497, a verdict of $2,500 was set aside in an action for slander, where the words were spoken in high excitement, provoked by the plaintiff; and under a plea of justification it was shown the plaintiff had been indicted for the crime with which he was charged, and in connection with proof of doubtful associations and suspicious character. In the case of Scripps v. Reilly, above cited, a libel was published in a newspaper having about the circulation of the Enquirer, imputing a charge of adultery to a prominent citizen of Detroit; the jury returned a verdict for $4,000, and although a new trial was finally obtained, the fact that the damages were excessive was not suggested by the astute counsel who defended the case. Upon the re-trial the verdict was increased to $5,000. In Neal v. Lewis, 2 Bay, 204, the supreme court of South Carolina refused to set aside a verdict for $3,000 for calling the plaintiff a rascal, a villain, a swindler and thief.

While if the language used in the case under consideration had simply been spoken of the plaintiff in the presence of a few persons, or had been published only in a letter or other private communication, the damages might be excessive enough to justify the interposition of the court, a very different rule obtains where the publicity given to the charge is so great. While there was no evidence of express malice, there is certainly testimony tending to show that the steamer Bostonia, on which the crime was charged to have taken place, made frequent trips to Cincinnati, and that very slight diligence on the part of the defendant in sending a messenger to the steamer would have shown the falsity of the charge.

The disagreeable feature of the case was the fact that the plaintiff and defendant were publishers of newspapers of opposite politics, but as the instructions to the jury were characterized by great fairness and temperateness of language, as they were strictly cautioned against political influence, and as the amount of the verdict was entirely consistent with the absence of such influence, I see no reason for taking this into consideration. While juries are very apt to be biased, more or less, by their political or religious opinions, it would be very unsafe for courts to assume that a verdict was dictated by those considerations, without clear proof of the fact. The charge made against the plaintiff was one very likely to injure him severely in his social relations, and to impair his reputation among his neighbors as a good citizen. The publicity given to it in defendant's paper was very great. The amount of the verdict suggests a compromise of conflicting opinions, and I think it quite within the discretionary limits of the jury. The motion for a new trial must be denied.

[Subsequently decision was rendered modifying the judgment. See Case No. 5,391.]