## POST PUB. CO. v. HALLAM.

(Circuit Court of Appeals, Sixth Circuit.  December 9, 1893.)

No. 120.

1. LIBEL—EVIDENCE—PRIOR PUBLICATIONS.
    A prior or contemporaneous publication in another newspaper owned by defendant is competent evidence on the question of malice, although a

separate suit is pending thereon. A double recovery is to be avoided by a caution from the court that damages can be allowed only for the article sued on. Frazier v. McCloskey, 60 N. Y. 337, disapproved.

2. SAME—CROSS-EXAMINATION.

Where the editors of a newspaper have testified that the publication was without malice, and their feeling towards plaintiff friendly, it is competent, on cross-examination, to show by them that they had never published notice that plaintiff had sued them, and that they had an agreement with other papers not to publish notice of the bringing of libel suits; thus even suppressing the knowledge that plaintiff was seeking to vindicate his reputation in the courts.

3. SAME.

It is competent, in the cross-examination of an editor who has testified to good faith and freedom from malice, to prove statements by him, in conversation with plaintiff after the publication, which tend to show that it was his policy, in conducting the paper, to increase its circulation by making sensational charges against individuals, thus showing a reckless indifference to the rights and reputations of others, equivalent to malice.

4. SAME—REPUTATION—REBUTTAL EVIDENCE.

Where the libelous charge is that a candidate for office sold out to a rival, and the defense has given evidence that his reputation for integrity in politics is bad, the evidence in rebuttal may go to his general reputation for integrity, and need not be confined to the matter of political conduct. 55 Fed. 456, affirmed.

5. SAME—EVIDENCE OF GOOD FAITH—REBUTTAL.

If defendant, for the purpose of showing good faith, is allowed to prove the circulation of rumors interpreting plaintiff's conduct in the same way as stated in the publication, there is no error in permitting plaintiff to show in rebuttal the existence of a widespread, general understanding which placed an entirely innocent interpretation on his acts.

6. SAME—PROVINCE OF JURY.

On the question as to the meaning of the publication the jury are to determine, not what defendant intended to charge, but what in fact he did charge, and what the reading public might reasonably suppose he intended to charge. 55 Fed. 456, affirmed.

7. SAME—PRIVILEGED COMMUNICATIONS.

False allegations of fact, charging a candidate for office with disgraceful conduct, are not privileged; and good faith and probable cause constitute no defense. 55 Fed. 456, affirmed.

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

At Law. Action by Theodore F. Hallam against the Post Publishing Company for libel. Verdict for plaintiff. Motion for new trial denied, (55 Fed. 456,) and judgment for plaintiff entered on verdict. Defendant brings error. Affirmed.

Statement by TAFT, Circuit Judge:

This was a writ of error to reverse the judgment of the circuit court in favor of Theodore F. Hallam against the Post Publishing Company for $2,500 for libel.

After the proper averments of jurisdiction, the petition of the plaintiff below stated his case as follows:

"Prior to October 14, 1892, plaintiff, as was well known to the people of Kenton county, Kentucky, where he lived, and to the people of Hamilton county, Ohio, and other counties of Ohio, was a candidate, in competition with Albert S. Berry, similarly well known to be such candidate, and in competition with other candidates, for the nomination, before the Democratic convention of the sixth Kentucky congressional district, for the office of representative in the congress of the United States for said district. That

for a long time prior to and on October 14, 1892, defendant was engaged in the business of composing, printing, publishing, and circulating a daily newspaper called the Cincinnati Post, which paper it claimed on that day had a daily circulation more than double that of any other daily paper in Ohio, save one in Cleveland, and a circulation in Cincinnati and Hamilton county on week days 10,000 in excess of the combined circulation of the English morning papers and the only other English evening paper. Prior to the meeting of said convention, which met at Warsaw, Kentucky, plaintiff contracted with the St. Nicholas, a company engaged in the business of catering and keeping a hotel, acting through E. N. Roth, to furnish, on board the steamer Henrietta, food and drink for the use of delegates and friends of said Hallam, who were about to proceed on said steamer to Warsaw to attend said convention,-for which said food and drink so to be furnished, and which was thereafter furnished, by said St. Nicholas, said Hallam agreed to pay said St. Nicholas. At said convention, after it had been in session for several days, and many ballots had been taken without a nomination being reached, said plaintiff finally requested the delegates from his county, who had continuously voted for him, to cast their next ballot for said Berry, and thereupon on the next ballot, by the aid of the votes so cast by the delegates from Kenton county, said Berry was nominated as the candidate for said office by said convention on September 30, 1892. And thereafter, on October 14, 1892, defendant, knowing the premises, composed and published in its said newspaper, of and concerning the plaintiff and his conduct as a candidate for nomination at the hands of said convention, the following false, malicious, and libelous article:

" 'Berry Paid.

" 'Expenses of Theo. Hallam in the Sixth (Ky.) District Contest for the Nomination of a Democrat for Congress.

" 'The Berry-Hallam congressional fight in the sixth Kentucky district is still on,—that is to say, Banquo's ghost bobs up now and then, to the annoyance of the congressional nominee, Berry, and the mortification of the defeated candidate, Theo. F. Hallam. The Boone County Recorder delivers a broadside at the Kenton county delegates, and naively asks: "Why don't they come out and tell the truth about what induced them to go to Berry? The world knows." Yes, the world knows, and you may say Mars and the planets know it also. Proprietor Roth, of the St. Nicholas Hotel, has an inside cinch on this inside information. Everyone knows Colonel Berry. He is a monopolist, corporation controller, millionaire speculator, political wirepuller, first-class hustler, and a pretty good sort of a fellow. Hallam is a successful lawyer at Covington; but legal eminence does not mean the fat incomes that are its synonyms on this side of the Ohio. Hallam is one of the bhoys, loves ward politics for the fun, if not the emoluments, and is about as poor as a church mouse. In fact, he owes several hundred dollars for taxes. The two counties, Kenton and Campbell, threw out their hooks for the congressional nomination. Kenton swore by Hallam, while Campbell vowed that the political friend and chum of Carlisle, Cassius M. Clay, Jr., and Charles J. Helm, their own millionaire and boss, Albert S. Berry, should be the nominee. The fight waxed hot. The convention was held at Warsaw, commencing on September 27th, and ending September 30th. The Kenton boys prepared for the fray. The principal preparation consisted in engaging the steamer Henrietta to carry the delegates to Warsaw, and the carte blanche orders of Mr. Roth, of the St. Nicholas hostelry, to fill her up from truck to keelson with the best the cellar and the larder of the house afforded. As one delegate remarked: "Why, the champagne flowed off the decks so much that even the Henrietta was swimming in it." Hallam and his crowd did all the feasting and the drinking. The Campbell county men were not in it. But the bill was made out to Colonel A. S. Berry. Here is the bill: "St Nicholas. Edward N. Roth. Cincinnati, October 10, 1892. Colonel A. S. Berry, per Theodore F. Hallam, to the St. Nicholas Hotel Company, Dr.: For meals, service, wine, and cigars served on board the steamer Henrietta, $865.15." ' Then again: 'At Warsaw the battle raged four days. On the last day Colonel Berry and Lawyer Hallam were seen to go arm

in arm to the rear of the courthouse, where the convention was held. They had a quiet and confidential chat. At its conclusion Hallam called his warriors about him, and spoke to them in whispers. Immediately thereafter the whole Kenton county delegation cast its vote for Colonel Berry, and he received the nomination. Is Colonel Berry carrying out all and every one of the promises he made? Ah, there's the rub. Mr. Roth, of the St. Nicholas, has sent a bill of $865.15 to Colonel A. S. Berry. That bill is for "dry" and "wet" provisions ordered by Hallam, and disposed of by Hallam's supporters. Such generosity on the part of the victor to the vanquished is truly touching.' Thereby meaning that said Hallam had requested his supporters, the delegates from Kenton county to said convention, to cast their votes upon the conclusive ballot for said Berry, in pursuance of a corrupt understanding or bargain between said Hallam and Berry, and for a pecuniary consideration to be paid by said Berry, and particularly upon the understanding that, in consideration of said Hallam's procuring the said delegates from Kenton county to cast their votes on said ballot for said Berry, said Berry would pay to the said St. Nicholas the bill for the food and drink which said Hallam had ordered, and for payment of which said Hallam was liable to said St. Nicholas. Wherefore plaintiff prays judgment against defendant for damages in the sum of ten thousand dollars."

The answer of the Post Publishing Company was as follows:

"And now comes the Post Publishing Company, defendant in the above cause, and for answer to the petition therein says: It admits that it is a corporation organized under the laws of Ohio, and a resident of that state. It admits that prior to October 14, 1892, the plaintiff was a candidate in competition with Albert S. Berry at the Democratic convention for nomination of a Democratic candidate for congress in that district. It admits that it was engaged on October 14th in printing and publishing the Cincinnati Post, of the circulation described in the said petition. It admits that plaintiff contracted with the St. Nicholas Company, or Hotel, for the supply of provisions, food, and drink for the use of delegates attending said convention; that said food and drink were thereafter furnished on board the steamer Henrietta, and, if need be, elsewhere, for which the plaintiff was to become, and did become, indebted. It admits that, after a session of several days of the said convention without nomination, the delegation from Kenton county, being the county of the plaintiff, at plaintiff's request cast their votes on a final ballot for said Berry, and thereby secured his nomination on the 30th day of September, 1892, having previous thereto continuously supported plaintiff as against said Berry. It admits that it published in the Cincinnati Post the article contained in said petition, but denies each and every other allegation thereof."

The evidence of the plaintiff and his witnesses tended to show that the charge or insinuation that he had received any consideration for influencing his supporters to transfer their votes to Berry was wholly unfounded; that Campbell, the Covington reporter of the defendant, falsely representing himself by telephone to be Berry's son, requested the St. Nicholas Hotel to make out Hallam's bill, and deliver it to the messenger he would send; that, thereafter, another employe of the defendant, also representing himself as Berry's son, went to the St. Nicholas Hotel, and got the bill against Hallam, but afterwards brought it back, and said that he did not want the bill made to Hallam, but to Berry per Hallam, and the bill to Col. A. S. Berry per Theodore F. Hallam was accordingly made out and delivered to him; that this conduct of the reporters of the defendant was without the knowledge or consent of Hallam or Berry. The evidence for defendant tended to show that the employes of defendant had not suggested the form of the hotel bill, and to show good faith and no malice in the publication.

The article set forth in the petition was an abridged statement of the contents of a much longer, more detailed, and more conspicuous and sensational article, which appeared in a paper published by the defendant, called the Kentucky Post. In the longer article was printed a fac simile of the bill obtained from the St. Nicholas Hotel by defendant's employes. The defendant published, in the afternoon of each day except Sunday, several editions of the Cincinnati Post and of the Kentucky Post. Matters of gen-

eral interest were identical in the two papers. News of peculiar local interest in Kentucky was given at large in the Kentucky Post, and only in abridged form in the Cincinnati Post. The latter had a wide circulation in Cincinnati and the surrounding country, but very little in Kentucky, while the former was circulated only in Kentucky. At the time of the trial in the court below another suit brought by Hallam against the defendant for damages for the publication of the article in the Kentucky Post was pending in the United States circuit court for Kentucky.

Bateman & Harper, for plaintiff in error.
Wilby & Wald and W. H. Jackson, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is first assigned for error that the circuit court admitted in evidence the article in the Kentucky Post. This was proper. The article was relevant for the purpose of showing malice. By the weight of authority, prior and contemporaneous publications of the same libel, other than that declared on, are competent evidence to show malice, whether such other publications may themselves be made the basis of recovery in separate suits or not; and the danger of a double recovery for the same publications is to be avoided by a caution from the court that damages are to be allowed only for the article sued on. VanDerveer v. Sutphin, 5 Ohio St. 293; Pearson v. Lemaitre, 5 Man. & G. 700; Chamberlin v. Vance, 51 Cal. 75; Shock v. McChesney, 2 Yeates, 473; Gibson v. Cincinnati Enquirer, 2 Flip. 121; Townsh. Sland. & L. § 392; Odgers, L. & Sland. 272; Newell, Defam. 331. In its charge the circuit court, calling the jury's attention to the pendency of the suit in Kentucky for damages for the Kentucky Post article, quite distinctly told them not to find any damages except for the article in the Cincinnati Post. In New York, other publications of the same or different libels by the defendant are not admitted to prove malice, unless suit upon them is barred by limitation, or for some other reason, (Frazier v. McCloskey, 60 N. Y. 337;) but, as already stated, this is contrary to the weight of authority.

It was said that the introduction of the Kentucky Post article was likely to lead the jury to include damages for the malice of the Kentucky article in a verdict on the Cincinnati article. The fact is, doubtless, that the same motive—whether of malice or public interest—which prompted one article prompted the other. It was to enable the jury to judge what the real motive was that the Kentucky Post was admitted. There is nothing which prevents the award of exemplary damages for the same malice in separate publications of the same or similar libels. The same criminal intent may lead to the commission of two separate offenses, but they are separately punished by two sentences. It may be, as suggested by Judge Bartley in VanDerveer v. Sutphin, 5 Ohio St. 293, 296, and by the learned judge who presided at the trial below, that the judgment in the first suit would be competent evidence in the second

suit to reduce punitive damages; but that question is not before us.

It was urged by counsel that the Cincinnati and Kentucky publications were merely different editions of the same paper, and that the two libels were one and the same thing. Such an argument would be more relevant on a plea of res judicata in the second suit. But, if the contention be well founded, it removes the only reason suggested in any authority for excluding the Kentucky publication, —that is, that it may be made the basis of a second recovery.

It is assigned for error that the defendant's counsel was not permitted to ask the plaintiff, when on the stand, whether it was true that he had not paid his taxes. The statement that Hallam had not paid his taxes in the alleged libel was for the purpose of emphasizing his poverty, and thus lending probability to the insinuation that Hallam had sold his influence to Berry for the payment of the bill at the St. Nicholas Hotel. Defendant was permitted to show that Hallam was a man of small means, and whatever weight such a circumstance, with others shown, might reasonably have in the mind of the defendant to induce a bona fide belief in the charge against Hallam, the defendant had the benefit of before the jury. It does not appear that defendant's counsel made any proffer to the court of what he intended to show in answer to the question. It may be that Hallam would have answered that he had paid his taxes, and, if so, the defendant was not injured by the exclusion of the evidence. Moreover, the question was put on cross-examination, when nothing had been asked of Hallam on the subject in chief. In the federal courts, the right to cross-examine a witness is limited to matters stated in his direct examination. Houghton v. Jones, 1 Wall. 702. Had defendant's counsel deemed the matter of sufficient importance, it would have been easy for him to offer the record evidence of the nonpayment of Hallam's taxes when presenting defendant's evidence, and the ruling of the court then would have involved only the question of the relevancy of the evidence in mitigation. He did not do this. As the point is now presented on the record, there is no prejudicial error apparent.

The third assignment of error is that the court permitted counsel for the plaintiff, in cross-examining the managing and city editors of the defendant, to ask them whether, after the suit was brought, there had been any notice of it published in the defendant's newspapers. We think this was a circumstance which the jury might properly consider in weighing the direct evidence of these two editors to the effect that their feeling towards Hallam was friendly and free from malice. It is quite true that the defendant was under no legal obligation to publish the fact that Hallam had asserted, under oath, the falsity of defendant's statement concerning him, and had sought to vindicate his injured reputation by a suit; but the fact was of a class of facts usually recorded in the court news of every newspaper, and its intentional omission reflected on the good faith of the statement that the feeling of the defendant and its editors was entirely friendly to Hallam. A similar ruling was made by the court below with reference to evidence, also brought out on cross-examination of the same witnesses, that defendant was party to an

agreement with all the other newspapers of Cincinnati that they should not publish the fact that a libel suit had been brought against any one of them.   The agreement was not unlawful, but defendant's purpose thus manifested, to prevent one whose reputation should be injured by unfounded charges in defendant's columns from securing the partial remedy of publishing in any newspaper his denial under oath, and his intention to vindicate his character tended to show an indifference on defendant's part to the possible wrong it might do to such a person.   If, as was suggested by counsel, the motive for such an agreement can be found in the desire of the defendant not to impair its credit by publishing the fact of a suit for large damages against it, this is an argument to be addressed to the jury in explanation of the circumstance; but it is not so conclusive in its character as to prevent the circumstance from being relevant, for the reason already given.

It is next objected that the circuit court permitted plaintiff's counsel, on cross-examination of the witness McRae, to ask the following question in regard to a conversation between the witness and Hallam at the St. Nicholas Hotel after the publication:

"Q. Did not Mr. Hallam further say this to you: 'The way that you are running that paper, you want to have it so that when one man meets another on the street he will say, "Did you see that terrible roasting that so and so got this afternoon?" and thereupon the other man will say, "No, I wonder where I can get a paper." ' And did you not thereupon reply to him, 'That is modern journalism?' A. No, sir; I did not."

And the plaintiff was subsequently permitted on the stand to testify that such a conversation as that implied in the foregoing question did take place.

McRae testified on direct examination that the article had been submitted to him by the editor who prepared it, with the assurance that it truly stated the facts as developed after a thorough investigation, and that he thereupon approved its publication because it was news of much public interest.   He denied having any malice toward Hallam.   The conversation embodied in the foregoing question, if it occurred, would tend to show that McRae's policy in conducting the newspaper was to increase its sale by making sensational charges against individuals,—a policy which would strongly indicate reckless indifference on his part to the rights and reputations of others. It is well settled that reckless indifference to the rights of others is equivalent to the intentional violation of them, and that for the one, as well as the other, a jury in a case of libel or other tort may give punitive or exemplary damages.   Association v. Rutherford, 1 U. S. App. 296, 2 C. C. A. 354, 51 Fed. 513; Gott v. Pulsifer, 122 Mass. 235, 239; Warner v. Publishing Co., 132 N. Y. 181, 30 N. E. 393; Holmes v. Jones, 121 N. Y. 461, 24 N. E. 701.   If, in approving the publication, McRae was moved by malice or its equivalent, he so far represented the defendant corporation as its general manager that his malice was in law the malice of the defendant.   Railway Co. v. Prentice, 147 U. S. 101, 114, 13 Sup. Ct. 261; Railway Co. v. Harris, 122 U. S. 610, 7 Sup. Ct. 1286.   If the conversation occurred, it had a tendency to contradict McRae on the subject of his motive in publishing the article, which thus was one of the main issues in the

case, and not a mere collateral matter. It was, therefore, manifestly proper for the plaintiff, in rebuttal, to adduce evidence to show that such a conversation did take place, in order to impeach McRae's credibility as a witness in regard to the important issue of malice.

Another error assigned is that the court permitted plaintiff to introduce evidence of his general character for integrity, to rebut evidence offered by defendant that Hallam's reputation for integrity in politics was bad. It is undoubtedly the rule that evidence as to reputation upon the question of damages must be confined to the reputation for that particular trait of character which is involved in the libelous charge. Drown v. Allen, 91 Pa. St. 393; Duval v. Davy, 32 Ohio St. 604; Sanford v. Rowley, 93 Mich. 119, 52 N. W. 1119; Moyer v. Moyer, 49 Pa. St. 210; Greenl. Ev. § 55. When a man is charged with selling his influence in a political convention, the trait of his character which is attacked is his integrity,—his general integrity. If a man's general reputation for integrity is good, proof of it certainly rebuts evidence that he has a reputation for corruptly selling himself in political conventions, for the two are inconsistent. We should be loth to differentiate a want of integrity in political matters from the same failing in business or society.

The theory upon which evidence of bad reputation may be introduced in libel cases is that a man with a bad reputation in the phase of character involved in the charge has very little reputation to lose from such a charge, though false, and is therefore entitled to but little compensation. But, if a man can show a good general reputation for integrity, he has much to lose from a false charge of corruptly selling his influence in politics, and, when it is attempted to diminish his loss by evidence of bad reputation for political integrity, he may very well be permitted to rebut such evidence, and its intended effect, by showing that he has always been regarded as a man of general integrity in all transactions of his life.

The cases cited by counsel for defendant do not sustain his contention. In Moyer v. Moyer, 49 Pa. St. 211, it was held that it was competent in a libel suit, where the charge was perjury, for the defendant to show that plaintiff's reputation for truth and veracity was bad. If the rule were as strict as here contended for, then, in the case cited, the defendant should have been limited to proving that plaintiff's reputation for telling the truth under oath in court was bad. In Sanford v. Rowley, 93 Mich. 119, 52 N. W. 1119, where the libel charged political treachery and lying, the defendant was permitted to prove that the plaintiff's reputation for political treachery and lying was bad; but it was stated by the court that the defendant might have shown that plaintiff's reputation for truth and veracity generally was bad. Say the court (page 124, 93 Mich., and page 1121, 52 N. W.:)

"It would necessarily follow, if these [i. e. bad reputation for treachery and lying in political matters] were shown, that the plaintiff's general reputation for truth was bad, for it can hardly be conceived that a person whose general reputation for truth is bad, in a political sense, has a good reputation for truth and veracity."

In Drown v. Allen, 91 Pa. St. 393, the charge was that the plaintiff was a thief, and the defendant offered to prove that he had that reputation, but the trial court restricted him to proving that plaintiff's reputation for honesty was bad. The supreme court reversed this ruling, and held that the defendant was entitled to show plaintiff's reputation for being a thief. In neither of these cases was it held that the plaintiff might not have rebutted, in the one case by proof of general reputation for veracity, or in the other by proof of general reputation for honesty. In the case at bar the defendant was permitted to offer proof of the plaintiff's bad reputation for integrity in politics, and was not compelled to attack his general integrity. The objection here is that plaintiff was permitted to rebut by showing his general integrity. The objection can only be sustained on the theory that a man's general reputation for integrity may be good, and his reputation for corruptly selling his political influence may be bad,—a theory to which, as already said, we cannot yield our assent.

The defendant was permitted to offer evidence that its editor who prepared the article had heard, from several sources, rumors that Hallam had transferred his support to Berry for a money consideration. In rebuttal the plaintiff offered, and was allowed to introduce, over defendant's objection, evidence that it was the general and widespread understanding at the convention and in the community that the reason why Hallam and his supporters, after giving up the fight in his behalf, transferred their votes to Berry instead of to a country candidate, was that they had transferred their votes from Hallam to country candidates in previous conventions, and they resented the ingratitude of the delegates from the country counties in not coming to Hallam's aid in this convention. This is assigned for error.

There is much conflict of authority on the point whether the defendant may give evidence of rumors, known to defendant, in mitigation of damages, and the cases will be found cited in Townsh. Sland. & L. (4th Ed.) § 411. A well considered case is that of Scott v. Sampson, 8 Q. B. Div. 491, where such evidence is held to be improper. See, also, Edwards v. Publishing Co., (Cal.) 34 Pac. 128. The circuit court, in admitting the evidence, followed the decision of the supreme court of Ohio in VanDerveer v. Sutphin, 5 Ohio St. 293. It is unnecessary for us to decide the question, for it is clear that if the defendant opened the door to evidence of rumors, however incompetent, it cannot be heard to object to the plaintiff's offering the same kind of evidence in rebuttal. Bogk v. Gassert, 149 U. S. 17, 25, 13 Sup. Ct. 738; Ward v. Manufacturing Co., 56 Fed. 437, 441, 5 C. C. A. 538; Elliott's App. Proc. § 628, and cases cited. All that we have to consider, therefore, is whether the evidence of rumors put in by plaintiff was in rebuttal to that offered by defendant.

Defendant offered the rumors to show that its reporter had some basis for his belief, and acted in good faith, and thus to disprove actual malice or wanton negligence or indifference. The plaintiff, by showing other reports which were so widespread through the

community that any one investigating the matter must have heard them, and which offered an explanation of the transfer of the Kenton county vote consistent with Hallam's integrity and that of his followers, made it appear probable that the reporter of the defendant had the benefit of this explanation, or at any rate could have had it by the slightest inquiries, and yet preferred that which reflected on Hallam. A failure to refer in the article to the explanation favorable to Hallam certainly tended to rebut the claim of good faith in its publication, based only on the hostile rumors. This was the effect of the charge of the court on the subject. We do not think that there is any reversible error in the ruling.

It is further objected that the court did not submit the question to the jury whether the innuendo of the petition was sustained by the libel, because issue had been made upon the innuendo, and the defendant was entitled to have the question of the meaning of the article submitted to the jury as a question of fact. From a reading of the charge of the court it seems to us that the question what the article in fact did mean was most fully left to the jury. The court refused to give a charge on the subject which was requested by the defendant below. That charge was as follows:

"In order to entitle the plaintiff to recover in this action it will be necessary that he shall satisfy you, by a reasonable preponderance of proof, of the allegation of that part of the petition usually called the 'innuendo,'—that is to say, that by the article published the defendant intended to charge said Hallam with having requested his supporters to cast their votes upon the last ballot for Berry for a pecuniary consideration to be paid by said Berry, and especially that he should pay to the St. Nicholas Hotel the bill incurred by said Hallam for food and drink ordered by him; and, unless you shall find that the defendant did so intend and charge, you will find for the defendant."

The charge was rightly refused. The question in the case was not what the plaintiff intended to charge in the article, but what in fact he did charge, and what the public who were to read the article might reasonably suppose he intended to charge. Curtis v. Mussey, 6 Gray, 261. No error can be based on the refusal of the court to give the charge stated.

Finally, we come to those assignments of error which are based on the charge of the court in regard to privileged communications. The court in effect told the jury that the article in question, relating, as it did, to a matter of public interest, came within a class of communications that were conditionally privileged; that the public acts of public men (and candidates for office were public men) could be lawfully made the subject of comment and criticism, not only by the press, but also by all members of the public, for the press had no higher rights than the individual; but that while criticism and comment, however severe, if in good faith, were privileged, false allegations of fact, as, for instance, that the candidate had committed disgraceful acts, were not privileged, and that, if the charges were false, good faith and probable cause were no defense, though they might mitigate damages. Counsel for the plaintiff in error and the defendant below has argued with great vigor and an array of authorities that we ought not to adopt the view of the

circuit court upon this important question, but should hold that the privilege extends to statements of fact as well as comment.

The argument is this: Privileged communications comprehend all bona fide statements in performance of any duty, whether legal, moral, or social, even though of imperfect obligation, when made with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they are made. Townsh. Sland. & L. § 209. It is of the deepest interest to the public that they should know facts showing that a candidate for office is unfit to be chosen. Therefore, every one who has reasonable ground for believing, and does believe, that such a candidate has committed disgraceful acts affecting his fitness for the office he seeks, should have the right to give the public the benefit of his information, without making himself liable in damages for untrue statements, unless malice is shown. Though of imperfect obligation, it is said to be the highest duty of the daily newspaper to keep the public informed of facts concerning those who are seeking their suffrages and confidence. Can it be possible, it is asked, that public policy will make privileged an unfounded charge of dishonesty or criminality against one seeking private service, when made to the private individual with whom service is sought, and yet will not extend the same protection to him who in good faith informs the public of charges against applicants for service with them? Is it not, at least, as important that the high functions of public office should be well discharged, as that those in private service should be faithful and honest?

The a fortiori step in this reasoning is only apparent. It is not real. The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good.

We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof,

and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation.    But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof.    The freedom of the press is not in danger from the enforcement of the rule we uphold.    No one reading the newspaper of the present day can be impressed with the idea that statements of fact concerning public men, and charges against them, are unduly guarded or restricted; and yet the rule complained of is the law in many of the states of the Union and in England.

In Davis v. Shepstone, 11 App. Cas. 187, Lord Chancellor Herschell delivered the judgment of the judicial committee of the privy council in an appeal from a judgment for libel recovered in the supreme court of Natal.    The plaintiff below was a resident commissioner of Great Britain in Zululand, and the alleged libel charged him with having committed unprovoked and altogether indefensible assaults upon certain Zulu chiefs.    The publication was made in the colony of Natal, where the conduct of the resident commissioner in Zululand was of great public interest.    It was claimed that the article was conditionally privileged, and that the plaintiff ought to have succeeded only on proof of express malice.    This claim was denied.    The lord chancellor thus stated the law:

"There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the public.    But the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed or discreditable language used. It is one thing to comment upon or criticise, even with severity, the acknowledged or approved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.    In the present case the appellants, in the passages which were complained of as libelous, charged the respondent, as now appears, without foundation, with having been guilty of specific acts of misconduct, and then proceeded, on the assumption that the charges were true, to comment upon his proceedings in language in the highest degree offensive and injurious.    Not only so, but they themselves vouched for the statements by asserting that, though some doubt had been thrown upon the truth of the story, the closest investigation would prove it to be correct.    In their lordships' opinion there is no warrant for the doctrine that defamatory matter thus published is regarded by the law as the subject of any privilege."

Other English cases laying down the same doctrine are Campbell v. Spottiswoode, 3 Fost. & F. 421, 432, affirmed 3 Best & S. 769, and Popham v. Pickburn, 7 Hurl. & N. 891, 898.    The latest American case, and the most satisfactory, is that of Burt v. Newspaper Co., 154 Mass. 238, 242, 28 N. E. 1, where Justice Holmes discusses the question, and quotes with approval the foregoing passage from the judgment in Davis v. Shepstone.    Other American cases approving the same rule are Smith v. Burrus, 106 Mo. 94, 101, 16 S. W. 881; Wheaton v. Beecher, 66 Mich. 307, 33 N. W. 503; Bronson v. Bruce, 59 Mich. 467, 26 N. W. 671; Brewer v. Weakley, 2 Overt. 99; Sweeney v. Baker, 13 W. Va. 183; Hamilton v. Eno, 81 N. Y. 126; Rearick v.

Wilcox, 81 Ill. 77; Negley v. Farrow, 60 Md. 158, 176; Jones v. Townsend, 21 Fla. 431, 451; Banner Pub. Co. v. State, 16 Lea, 176; Publishing Co. v. Moloney, (Ohio,) 33 N. E. 921; Seely v. Blair, Wright, (Ohio,) 358, 683; Wilson v. Fitch, 41 Cal. 383; Edwards v. Publishing Co., (Cal.) 34 Pac. 128; State v. Schmitt, 49 N. J. Law, 579, 586, 9 Atl. 774; Eviston v. Cramer, 57 Wis. 570, 15 N. W. 760.

In Publishing Co. v. Moloney, supra, the supreme court of Ohio say, with reference to the doctrine that statements of fact should be regarded as privileged when made concerning a candidate for an office, as follows:

"We do not think the doctrine either sound or wholesome. In our opinion, a person who enters upon a public office, or becomes a candidate for one, no more surrenders to the public his private character than he does his private property. Remedy, by due course of law, for injury to each, is secured by the same constitutional guaranty, and the one is no less inviolable than the other. To hold otherwise would, in our judgment, drive reputable men from public positions, and fill their places with others having no regard for their reputation, and thus defeat the purpose of the rule contended for, and overturn the reason upon which it is sought to sustain it. That rule has not been generally adopted in this country, and the converse of it has hitherto obtained in this state."

The view we have taken of the main question makes it unnecessary for us to consider whether the privilege claimed could extend, in any event, to statements concerning Hallam published two weeks after he ceased to be a candidate, and made to a public none of whom was a voter or a citizen of the congressional district in which Hallam had offered himself as a candidate.

Having examined the record and the assignments of error with much care, we find no error prejudicial to the defendant below, and therefore affirm the judgment of the circuit court, with costs.