## THATCHER v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.    April 17, 1914.)

### No. 2314.

1. APPEAL AND ERROR (§ 4*)—DISBARMENT PROCEEDINGS—REVIEW.

An order disbarring an attorney from practice in the federal courts is reviewable on writ of error and not by appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 8–21; Dec. Dig. § 4.*]

2. APPEAL AND ERROR (§ 10*)—RIGHT TO WRIT—NATURE OF REMEDY.

Mandamus is not an exclusive remedy for review by the Circuit Court of Appeals of an order disbarring an attorney from practice in the federal courts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 34–38; Dec. Dig. § 10.*]

3. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT OF ATTORNEY—CHARGES.

Respondent, an attorney, having been disbarred from practice in the state courts, proceedings were also instituted to disbar him from practicing in the federal courts; one of the charges being that he published a libelous attack on a judge of the state court, and, after reciting the proceedings in the Supreme Court of the state, concluding, "Your committee charges that said matters, of which said" respondent "was so found and adjudged guilty, are and constitute malpractice and sufficient to strike his name from the rolls of the court." Held, that respondent was not entitled, in such proceeding, to invoke the strict rules governing indictments and proofs in criminal cases, and a holding that the state court findings were prima facie proof, and that respondent, attacking them, must produce the transcript of evidence there given, was not prejudicial, even if erroneous, where in the end it appeared that all essential facts were undisputed.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. Dig. § 53.*]

4. ATTORNEY AND CLIENT (§ 43*)—MISCONDUCT—CRITICISM OF CANDIDATE FOR JUDGE.

An attorney may freely criticise a candidate for re-election to a judicial office, so far as the facts justify, and may give expressions of opinion adverse to the candidate's qualifications, if made in good faith, and is not confined to such statements as are "decent and respectful."

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 59, 60; Dec. Dig. § 43.*]

5. ATTORNEY AND CLIENT (§ 43*)—MISCONDUCT OF ATTORNEY.

Where the publication by a lawyer of a circular attacking a judge, who is a candidate for re-election, is alleged to be a libel, justifying the publisher's disbarment, the circular must be read against its composers with the same meaning they intended its expected readers should draw; and it cannot be considered as if composed by laymen or put before an audience of lawyers.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 59, 60; Dec. Dig. § 43.*]

6. ATTORNEY AND CLIENT (§ 43*)—DISBARMENT—GROUNDS.

Where a respondent, an attorney, in order to prevent the re-election of a judge of a state court, issued and procured the distribution of a circular charging that the judge was and would be a corrupt tool for the corporations directing verdicts and granting injunctions in their favor without caring for the right of the case, and supported such charge by statements of only fractional truths, so that the circular, according to its ordi-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

212 F.—51

nary meaning, was willfully false, and no attempt was made to show either that it was true or that respondent had reasonable grounds to believe that it was true, he was guilty of gross professional misconduct warranting his disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 59, 60; Dec. Dig. § 43.*]

7. ATTORNEY AND CLIENT (§ 44*)—MISCONDUCT OF ATTORNEY—DISBARMENT.
R. having loaned M. and H. $2,400 on their joint notes, M. employed respondent as his personal attorney in certain controversies with H. and to bring about an exchange of the notes for certain other notes belonging to M., secured by collateral. Respondent, after accomplishing this result, accepted professional employment as attorney for R. in an attempt to overturn such exchange without notice to M. *Held* that, though respondent was successful in this, and a verdict was had based on the theory that M., through respondent, had committed a fraud on R., respondent was guilty of misconduct warranting disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 55, 56, 62; Dec. Dig. § 44.*]

8. ATTORNEY AND CLIENT (§ 38*)—MISCONDUCT OF ATTORNEY—DISBARMENT.
Where respondent, an attorney, presented a bill of exceptions for signature, altered from the condition in which it was when the opposing attorneys stipulated for its allowance, caused his client to execute a pleading charging fraud against another attorney, when there was nothing to indicate the existence of any fraud, or that respondent had any reason to suppose he could obtain evidence to establish same, and also obtained judgment against his own ignorant client, without the latter's understanding and knowledge, such acts were so reprehensible as to justify disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. § 38.*]

In Error to and Appeal from the Circuit and District Courts of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Proceeding for the disbarment of Charles A. Thatcher, an attorney at law, from practicing in the federal courts. From a judgment in favor of the United States, respondent appeals and brings error. Appeal dismissed and order (190 Fed. 969) affirmed.

R. P. Cary, of Memphis, Tenn., for plaintiff.

G. P. Kirby and C. A. Seiders, both of Toledo, Ohio, for defendant.

Before DENISON, Circuit Judge, and COCHRAN and SANFORD, District Judges.

PER CURIAM. Charles H. Thatcher was an attorney and counselor of the Supreme Court of Ohio and of the United States District Court for the Northern District of Ohio and of this court. The Supreme Court of Ohio found him guilty of professional misconduct and disbarred him. A transcript of that action was presented to this court and a motion made for the entry of a similar order here. That motion was founded wholly upon the action of the Supreme Court of Ohio and did not independently charge the existence of those facts upon which the order of that court depended. This court, Judges Lurton, Severens, and Warrington sitting, held, upon the authority of Ex parte Tillinghast, 4 Pet. 108, 7 L. Ed. 798, that the proposed

action could not rest merely upon the judgment of a court of another jurisdiction, but must be based upon allegation and proof of the actual offense. Accordingly a committee of the bar was appointed by this court to formulate and file charges against Mr. Thatcher, either in this court or in the District Court. Later, the District Court, upon due suggestion, appointed a committee for a similar purpose, and that committee filed, in that court, a petition containing five charges,[1] which may be thus briefly summarized: (1) Publishing a libelous attack on a judge of a state court, by statements which respondent knew to be untrue; (2) bringing suit upon notes which he knew had been paid, and as part of a scheme to defraud a former client; (3) misleading District Judge (now Circuit Judge) Knappen by a proceeding analogous to forgery (altering an executed stipulation), whereby an irregular bill of exceptions was obtained; (4) causing an illiterate client to sign and file a pleading which charged fraud against other attorneys while respondent knew there was no evidence to support such a charge, and knew that the client did not understand the paper he was signing; and (5) bringing suit for his fees and obtaining a judgment by default against the same illiterate client, knowing that the client did not comprehend what was going on. The first two charges had been sustained by the Supreme Court of Ohio and formed a part of the basis of its action; the other three were first made in this proceeding.

We must first pass upon a motion made by the prosecuting committee to dismiss both appeal and writ of error. This motion is based upon the theory that only by mandamus can we review a disbarment order, and hence the motion denies that such an order is included within the classification, "Final decisions of the District Courts in all cases other than those in which appeals and writs of error may be taken direct to the Supreme Court," found in the statutory grant to this court of jurisdiction to review by appeal or by writs of error. Section 128, Judicial Code; Act March 3, 1911, c. 231, 36 Stat. 1133 (U. S. Comp. St. Supp. 1911, p. 194).

[1] It is now settled that an order or decree of the District Court inflicting a fine or imprisonment as a punishment for contempt, as distinguished from such infliction intended to compel action for the benefit of a party, is a final decision or judgment subject to review by writ of error to the Circuit Court of Appeals. Bessette v. Conkey, 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997; In re Christensen, 194 U. S. 458, 24 Sup. Ct. 729, 48 L. Ed. 1072. It is held also, by this and other Circuit Courts of Appeals, that a judgment of deportation by the District Court is reviewable on appeal. United States v. Hung Chang (C. C. A. 6) 134 Fed. 19, 20, 67 C. C. A. 93; Gee Cue Beng v. United States (C. C. A. 5) 184 Fed. 383, 385, 106 C. C. A. 493. Neither the contempt nor the deportation proceeding is strictly criminal nor wholly civil. Each is well described as quasi criminal. In contempt, the criminal element, in deportation, the civil, is the dominant one. The disbarment proceeding is not the same as either

---

[1] Another charge, which the District Court found not sustained, is not here recited.

of these, but bears strong analogy to each. In disbarment, as in contempt, the inherent right and necessity for the court to protect itself against matters incompatible with its power and dignity is the underlying principle; in each, the judgment is a punishment inflicted to insure that protection. In disbarment, as in deportation, it is charged that respondent is not entitled to the status he is claiming, and the effect of the judgment is to deprive him of that status. Neither in contempt nor deportation matters is there any greater formality than here. The practice in contempts is often the same as in disbarments; charges are filed by some attorney acting at the order or suggestion of the court; a summary issue is made up and an informal trial is had before the court without a jury. In deportation the hearing before the District Court is summary and informal. We are unable to appreciate the force of the argument which admits, as it must, that each of these matters is a "case" included within the "all other cases" which we must review, and which yet denies the same name to a proceeding in which a general or special public prosecutor moves against an individual and procures from the court a final decision which imposes on the respondent punishment for his misconduct and banishment from his profession. Most of the reasoning in Bessette v. Conkey is clearly applicable to disbarment; and, for discussion of what constitutes a "case," see I. C. C. v. Brimson, 154 U. S. 447, 475, 155 U. S. 3, 14 Sup. Ct. 1125, 15 Sup. Ct. 19, 38 L. Ed. 1047, 39 L. Ed. 49; Fong Yue Ting v. United States, 149 U. S. 698, 728, 729, 13 Sup. Ct. 1016, 37 L. Ed. 905; Madisonville Co. v. Bernard Co., 196 U. S. 239, 25 Sup. Ct. 251, 49 L. Ed. 462.

[2] Respondent's contention that mandamus is the exclusive remedy is based on Ex parte Burr, 9 Wheat. 529, 6 L. Ed. 152; Ex parte Secombe, 19 How. 13, 15 L. Ed. 565; Ex parte Bradley, 7 Wall. 364, 19 L. Ed. 214; Ex parte Robinson, 19 Wall. 513, note, 22 L. Ed. 205; and Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552. What is said to be the essential holding is found in Ex parte Bradley, in which the opinion, in demonstrating that mandamus will lie because there is no other adequate remedy, says:

"The order disbarring them or subjecting them to fine or imprisonment is not reviewable by writ of error; it not being a judgment in the sense of the law for which this writ will lie."

This pronouncement applies as well to orders inflicting fine or imprisonment as to orders of disbarment; and, as to the former, the reference must be to punishments inflicted in contempt proceedings. Hence these decisions amount only to holding that neither appeal nor writ of error would lie to enable the Supreme Court to review contempt or disbarment orders. This is clearly true, since the jurisdiction of the Supreme Court, on appeal or writ of error, was always limited to "civil actions where the matter in dispute exceeds the sum or value of" a certain amount (section 13, c. 20, 1 Stat. 565, Act of Sept. 24, 1789; R. S. § 691); until the Act of March 3, 1891, c. 517, 26 Stat. 828 (U. S. Comp. St. 1901, p. 549), section 6 of which substituted "in all cases" for "in civil actions," but retained a minimum value limitation. The effect of these limitations was that the court

had no power to hear, on writ of error, any matter that did not involve a money value, and hence no power to review criminal cases (U. S. v. More, 3 Cranch, 159, 173, 2 L. Ed. 397; O'Neal v. United States, 190 U. S. 36, 38, 23 Sup. Ct. 776, 47 L. Ed. 945. Clearly, therefore, a decision that a writ of error to review disbarment did not lie from an inferior court to the Supreme Court, under the statutes involved in the foregoing cases, is not at all inconsistent with the conclusion that such a matter is within the grant (in this respect unrestricted) of appellate jurisdiction to the Circuit Courts of Appeals by the act of 1891 and the present Judicial Code.

We find no exact precedent. The Circuit Court of Appeals for the Ninth Circuit heard such a case on writ of error (Cobb v. U. S., 172 Fed. 641, 96 C. C. A. 477), but the precise point was not made (Barnes v. Lyons, 187 Fed. 881, 886, 110 C. C. A. 15). In the state courts, there is a multitude of cases. Review of disbarment orders has been had by writ of error, by appeal, by mandamus, and by certiorari, often without any discussion as to the proper remedy, and often evidently by virtue of special statutory provisions. We get no help from these decisions, save as demonstrating the universality of some suitable appellate remedy.

The choice of method, as between appeal and writ of error, is not clear, but we think the analogy is closer to contempt proceedings than to the deportation hearing, and it is clear that neither the hearing nor the final order was distinctively on the equity side of the court or involved a controversy within ordinary equitable jurisdiction. We therefore hold that error, and not appeal, is the proper remedy. Parish v. Ellis, 16 Pet. 451, 454, 10 L. Ed. 1028; Ormsby v. Webb, 134 U. S. 47, 65, 10 Sup. Ct. 478, 33 L. Ed. 805; Rode & Horn v. Phipps (C. C. A. 6) 195 Fed. 414, 419, 115 C. C. A. 316. It follows that the appeal is dismissed, and the motion to dismiss the writ of error is denied.

[3] Before reaching the merits, we must also meet another preliminary question, and this is an objection urged by respondent. He says that charge 1 did not amount to an allegation of the original offenses, but only that he had been, by the Ohio Supreme Court, convicted of these things. Hence he insists that his demurrer to this charge should have been sustained. In the same connection, he complains that he was compelled to put in evidence the transcript of the testimony taken before the State Supreme Court, and thus was compelled to give evidence against himself, and was tried, in part, upon proofs not taken in this case. Charge 1, as filed in this case (covering charges 1 and 2, as we have described them), recited the proceedings in the Supreme Court, and its order, and concluded:

"Your committee charges that said matters, of which said Charles A. Thatcher was so found and adjudged guilty, are and constitute malpractice and sufficient to strike the name of the said Charles A. Thatcher from the rolls of this court."

In overruling the demurrer to this charge and in the course of the hearing on this subject-matter, it was the theory of the District Judge, repeatedly announced, that, while the mere judgment of the state

court did not require the United States Court to take similar action, yet that the finding of facts, made by the former court, raised at least a prima facie presumption that the finding was correct; and the District Judge further thought that the full rights of the respondent in the United States Court would be preserved if he was permitted, as he was, to go as fully as he desired by himself and other witnesses into the whole subject-matter covered by the findings of the Ohio court, so that the entire question should be re-examined. It was as a corollary to this position that respondent, when proposing to show the error of these findings, was required to put in evidence a transcript of the proofs upon which those findings had been based, so that the United States Court, in reviewing the findings of the state court, could do so intelligently. We are not satisfied that the considerations governing a disbarment proceeding and the rules of comity as to the decisions in the highest court of the state in which the United States Court is sitting would have justified giving any less force than was thus given to the fact findings of that court; but, however that may be, respondent was not substantially prejudiced by the course taken. His error lies in supposing that he is entitled to invoke the strict rules governing indictments and proofs in criminal cases. There is no such strictness. No formal charging papers filed in court, preliminary to a rule to show cause, are necessary. Ex parte Wall, 107 U. S. 265, 271, 2 Sup. Ct. 569, 27 L. Ed. 552; Randall v. Brigham, 7 Wall. 523, 539, 19 L. Ed. 285. Proceedings may be summary; the only essentials are that the respondent should know what is to be the basis of the proposed action, and that he should have his day in court; i. e., fair opportunity to present his side of the controversy. Ex parte Burr, 2 Cranch, C. C. 379, Fed. Cas. No. 2,186; s. c., 9 Wheat. 529, 6 L. Ed. 152; U. S. v. Parks (C. C. Colo.) 93 Fed. 414; Ex parte Steinman, 95 Pa. 220, 40 Am. Rep. 637; Randall v. Brigham, supra. Respondent here fully understood what was charged; he had full opportunity to be heard and to offer proof on every point; his proofs taken in this case cover 150 pages. That the concluding paragraph of charge 1 alleges that the matters of which respondent had been by the state court found guilty "are cause to strike his name from the rolls," instead of alleging that it should be stricken from the rolls because he was guilty of the matters which had been so found, made no difference to him in his preparation and defense, after the court overruled the demurrer and announced the theory on which the case would proceed. That the transcript of the proofs before the Supreme Court of Ohio was put in evidence by him under compulsion did him no harm, since, at the conclusion of the hearing, nothing depended upon it. Every substantial thing there appearing and which is at all essential to support the order below was expressly or impliedly conceded to be true by respondent or by his witnesses in this proceeding, and was not, upon the hearing below or the hearing in this court, a matter of dispute. If there was any abstract error (and this we do not intend to intimate) in giving, for the time being, prima facie effect to the Supreme Court findings and in requiring respondent to put in the Supreme Court transcript, it was error without prejudice. In

a proceeding like this, where the court is investigating the professional fitness of one of its attorneys, and where it is the duty, at least the ethical duty, of that attorney to co-operate with the judge in getting at the truth, we cannot think that the final order must be reversed merely because facts, which are and always have been unquestioned by any one, got into evidence in an irregular way.

This brings us to what we may call the merits of the case, the question whether the proofs justified the final order, and we will briefly review the evidence on the respective charges.

[4] Mr. Thatcher's prima facie or underlying right, as a citizen, to criticise and attack a candidate for an elective office must be recognized, so long as the right is not abused. That the office is judicial, and that the candidate is then serving as judge, can make no difference in the basic principle involved. A judge who is a candidate for re-election must expect to have his qualifications freely discussed and summarily decided by an electorate which may not be well informed or discriminative. However unfortunate this, in specific instances, may seem, it is an essential part of the elective system, and as such it must be accepted. Nor does a citizen lose this right to criticise because he is a lawyer. We cannot think that a lawyer citizen's criticism of such a candidate must needs be confined to what is "decent and respectful." His criticism may be as indecent and disrespectful as the facts justify. The rule governing such campaign utterances must be that of qualified privilege: Where expressions of opinion, they are permitted, if in good faith; and, where statements of fact, they may be made, if true, or in good faith and with reasonable cause believed to be true, but they are forbidden if the derogatory fact allegations are false, and are by the utterer known, or with ordinary care should be known, to be false. In this modified form, the rule is accepted in all jurisdictions. 18 Am. & Eng. Encyc. 1041, 1042. This court has adopted the stricter rule that good faith and probable cause will not make a falsehood privileged. Post v. Hallam, 59 Fed. 530, 539, 8 C. C. A. 201. While we see no reason for not applying here what was held in Post v. Hallam, we assume, for the purpose of this case, the more liberal criterion and say that, as this is found one way or the other, Mr. Thatcher must be justified or condemned.

[5, 6] Charge No. 1 relates to the libelous circular. The matter developed in this way: In the fall of 1908, L. W. Morris had been one of the common pleas judges for 14 years. Mr. Thatcher, as attorney for plaintiff, had tried many personal injury cases before him, and a bitter personal antagonism between them had arisen. Judge Morris was a candidate for re-election.; Mr. Thatcher opposed him, and in good faith, as we assume, thought the judge unsuitable for the office. Shortly before, one Henry Gravelle had sued the street railway company for personal injury, and Judge Morris had directed verdict for defendant. The appellate courts had held the direction erroneous and awarded a new trial. Using the Gravelle case as a foundation, Mr. Thatcher participated in preparing the anti-Morris circular hereafter described, paid $160 for printing 40,000 copies, hired a trumpeter, and employed Gravelle, and took them in his automobile through

the factory districts at noon. When the trumpeter had drawn a crowd, Gravelle told his story and passed out the circulars.

The circular carries, on its title page, a picture of the "legless cripple" whom Judge Morris has "thrown out of court," and first gives a résumé (untrue in part) of the Gravelle case. It says that Judge Morris is a "foe of jury trials" and of "human rights," and that "for 14 years he has held for defendant in the case 'Man v. Dollars.'" Over a picture of the widow and children of a railroad man killed at his work, and with reference to whose death Judge Morris had held there was no liability, it has the caption, "No Jury Trial for Them;" and it prints, in contrast, pictures of the "Residence and Stables of Judge Morris" and of the "Cottage Rented by H. Gravelle." It says that to direct verdicts for the corporations and trusts was a "plan to undermine the jury system" and "has been a favorite practice of Judge Morris." "Many times has he thrust juries to one side and decided in favor of railroads, traction companies, and the corporations which are so careful of dollars and so careless of life and limb." Having made these general charges, the circular proceeds to its proofs; "from the records of a hundred cases, we select a few at random." Then follows Gravelle's statement, composed by Thatcher, in which Gravelle is made to say:

"My family and I have nearly starved. * * * Judge Morris is living in a mansion. * * * I want to save other poor cripples from his power. * * *"

Then are cited brief particulars of 10 personal injury cases against corporations in which Judge Morris had directed verdicts for defendant. On another page it is said:

"Gravelle's case and the others are only a few among many. Some of them are as follows."

Then follow two parallel columns, one headed "Corporations Deprived of Jury Trial by Judge Morris," and entirely blank; the other headed "Human Beings Deprived of Jury Trial by Judge Morris," and containing the docket numbers of 70 cases besides the 10 already mentioned.

Here is a charge in substance and effect that Judge Morris habitually and commonly and because of his hostility to the jury system directs verdicts for the defendant in personal injury cases against corporations; that the records show 100 such cases, 80 of which are identified by number. The intention is too plain for doubt to have the reader understand that the judge did this, not because it was the law or because he thought it was the law, but because of hostility to the jury system and favoritism to corporations—dishonorable and dishonest motives. The truth was that, in this class of cases, the judge had directed verdicts for defendant not more than twice a year on the average, that the 10 described cases had been selected from more than 20,000 cases in the common pleas courts, and from more than 2,000 cases by Judge Morris, and that the 70 further cases specifically identified were, it is true, instances of verdicts directed for defendant, but they were mostly not against corporations; they included cases

on contract and all varieties of torts, and only 10 personal injury cases against private corporations, in 7 of which 10 the judgment had been affirmed by the reviewing court. It is entirely clear that these facts neither support the charge nor furnish to an intelligent lawyer any reason to believe that the charge was true. This charge is a mixture of opinion and of fact. Its general derogatory terms might be construed as only opinion; but, while this view would lead towards immunity for the author, it would also weaken his convincing force to the reader. So there must be facts to support the conclusion; these facts were furnished "from the court records," and to the extent of 75 per cent. were falsely stated. To claim only one or two instances a year, or only 20 for the 14-year period, would be to weaken the charge, to make it absurd; to claim 100, or 80, and to suppress the length of time covered, would naturally impress the intended reader as strong proof. This cannot be overlooked as an incidental or immaterial statement, particularly in connection with the baseless and misleading parallel column display.

Another paragraph of the circular was entitled "Law is Against the Unfortunate," and says:

" 'The law is against the unfortunate,' said Judge Morris in one case where he directed a verdict. * * * In Judge Morris' court, the law is against the unfortunate only because Judge Morris considers it and declares it against the unfortunate."

The only pretended foundation for this charge is that, in directing a verdict upon the ground of contributory negligence (or assumed risk), the judge had once said that, in this particular, the law was against the unfortunate. The implication that the judge had not applied the established rule, but some new and vicious rule of his own, stands without justification.

Another charge to which much space is given is that Judge Morris was "an injunction judge." The circular recites that the street railway company's franchise will soon expire and the company will want injunctions against the city and that it knows by electing Judge Morris it "will have a friendly judge ready to issue the injunction and tie the city's hands." The language used in this part of the circular in connection with other parts and with the large type headings, "Purify the Bench," "Standard Oil Influence," "Know Their Friend," etc., are an allegation that the judge had been and would be ready to issue injunctions, not because of the law, but because of some favoritism to these corporations. There is no effort to justify this allegation. An illustration of the circular's method of telling untruths is this: The truth was that an injunction bill had been presented to the judge, who had required some defect to be supplied before he would act upon it, the correction had been made, and he indorsed the bill, "Injunction allowed as prayed." The circular says:

"Union officials say that the judge went so far as to suggest to the attorney how to make his petition stronger. * * * He did not even draw his own order, but simply wrote down, 'Injunction allowed as prayed.' The corporation attorneys say they drew the order as strong and as broad as possible."

This ingenious narrative is entitled "Attorneys Draw Order."

We have sufficiently reviewed the circular. (It may be seen in full in Re Thatcher, 80 Ohio St. 561, 581, 89 N. E. 39.) The argument that it is not libelous or is not untruthful depends upon the mistaken view that it cannot be condemned if skilled dialectitians can point out how each sentence or half sentence, standing alone, is not necessarily inconsistent with the facts. It is impossible to consider such a publication from that standpoint. It was drafted by Mr. Thatcher and his associates, skilled in the nice use of language and in the leaving of pegs whereon they might hang technical justifications; it was prepared and published to be read by and to. influence a class of the community not skilled in these things, and which would take it to mean what it seemed to mean; and it must be read against its composers with the same meaning which they intended its readers should draw. Its authors clearly intended that the voters should take it as a charge that Judge Morris was and would be a corrupt tool for the corporations, directing verdicts and granting injunctions in their favor without caring for the right of the case; and they supported this charge by statements of fractional truths which constitute the worst kind of falsehood. It cannot be considered as if it had been put before an audience of lawyers who would not be misled by its absurdities, or as if composed by laymen who could be excused by their ignorance. True, the use of the word "corrupt" and a direct, square charge of corruption are industriously avoided, but in a libel suit it would be for the jury to say whether the charge was made by innuendo; and an intelligent jury could give but one answer to that question.

Giving this meaning to the circular, there is no attempt to show either that it was true or that Mr. Thatcher had any reasonable grounds to believe it was true; nor can it be disputed that Mr. Thatcher's doings relating thereto were gross professional misconduct. Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552; U. S. v. Green (C. C. Col.) 85 Fed. 857; Cobb v. U. S. (C. C. A. 9) 172 Fed. 641, 96 C. C. A.. 477; Myers v. State, 46 Ohio St. 473, 489, 22 N. E. 43, 15 Am. St. Rep. 638.

As to charge 2, these things are the undisputed facts:

[7] Reiter had loaned to Milburn & Hudson, on their joint notes, about $2,400. The two debtors were involved in a number of joint liabilities, and each became uncollectible. Milburn employed Mr. Thatcher as his attorney in the resulting controversies with Hudson, and the attorney persuaded Reiter to exchange these notes for certain Murray notes belonging to Milburn and secured by collateral. Thereupon the Milburn & Hudson notes were delivered to Mr. Thatcher, and he, as Milburn's attorney, held them for several years. Murray never paid anything on his notes so transferred to Reiter; Murray was irresponsible; and the collateral was exhausted with trifling results, whereby Reiter got little. Milburn was entitled to demand from Hudson, by suit or on settling accounts, contribution of one-half the consideration which he had paid to Reiter; but Mr. Thatcher planned to bring suit in Reiter's name against Hudson on these notes,

not disclosing Milburn's title, to collect from Hudson the whole amount, and thus to earn the 66⅔ per cent. fee which Milburn was willing to give him if this could be done. The trouble was that, if Hudson was compelled to pay the notes to Reiter, Milburn would be liable over for contribution, and so would lose all benefit of his cheap purchase of the notes. Milburn apparently understood the nature of this danger; at any rate, he refused to allow Mr. Thatcher to sue the notes in Reiter's name, unless and until Milburn was "protected" by satisfactory agreement. Two years after Milburn's last such refusal, and without his knowledge, Mr. Thatcher entered into a contract with Reiter acknowledging holding the notes as attorney for Reiter, and agreeing to undertake collection for Reiter against Hudson; and later he caused suit to be brought on these notes in Reiter's name and as if nothing had ever been paid and as if they had always been Reiter's. In this suit Hudson and Milburn were defendants, but only Hudson was served. It was Mr. Thatcher's conduct in bringing this suit which was condemned by the Ohio Supreme Court as an attempt to deceive the court, defraud Hudson, and injure Milburn.

Obviously this conduct cannot be squared with any high professional standard; but Milburn had, at one time, said he was willing (if himself protected) that Reiter and Thatcher should have all they could collect from Hudson, and Mr. Thatcher may have thought he could so manipulate the matter as to guard Milburn against ultimate harm from the judgment to be obtained by Reiter. In view of these last considerations, and if the matter is to be treated on the theory that whatever rights there were under the notes really belonged to Milburn, we are not satisfied that the bringing of suit thereon in Reiter's name, as if they were wholly unpaid, of itself called for so severe a penalty as disbarment; but before leaving this subject we must notice the position in which Mr. Thatcher is put by the matter he now presents as a complete defense on this charge, viz.: That a jury has found a verdict for plaintiff in Reiter v. Hudson. Under the unquestioned situation so far recited, there was only one possible theory which could fully justify the prosecution of the Reiter suit on these notes for their full amount. That theory was first put forward by Mr. Thatcher in evidence which he offered in the Supreme Court, but which was not admitted (perhaps because in conflict with his answer); the same theory was embodied in the reply prepared and filed on behalf of Reiter in the suit so prosecuted after Hudson had answered and claimed that the notes had been paid and transferred to Milburn by the Milburn-Murray transactions; and upon that theory alone was based the judgment which Reiter in that case did eventually recover for the full amount of the notes. This theory was that Milburn knew the Murray notes and collateral to be practically worthless, that Reiter was deceived and defrauded in this exchange, and that, because of such fraud, Reiter had the right to rescind and had rescinded the exchange; and his later assertion of title in the notes depended on this fraud and this rescission. We may even accept Mr.

Thatcher's claim that he personally acted in good faith in persuading Reiter to take the Murray notes, and that acceptance makes no difference. The plain fact is that he was professionally employed by Milburn to bring about the Reiter-Murray exchange; that he accomplished this result; and that he then accepted professional employment in an adverse interest to attack and overturn his previous professional work. This was without notice to his former client, although notice would be of little importance. The fact that this effort was successful and that a verdict was had, based upon the theory that his former client had, through him, accomplished a fraud, Mr. Thatcher now puts forward as his full justification. Proof of such conduct supports a judgment of disbarment. In re Boone (C. C. Cal.) 83 Fed. 944.

[8] Charges 3, 4, and 5: It is sufficient to say that the evidence fairly supports the District Court's finding that these charges were established. As to the bill of exceptions, it is clear enough that, when presented to Judge Knappen, this was not in the same form as it was when the opposing attorneys had stipulated for its allowance, and it is not easy to understand how this could have been brought about without the deliberate action of Mr. Thatcher. As to causing his client to execute a pleading which charged fraud against another attorney, there is nothing to indicate the existence of any fraud or that Mr. Thatcher had any reason to suppose he could find evidence to establish the fraud; and he seems to have recklessly instigated an affidavit which was false and which he had no real reason to believe was true. At the same time, the situation was exasperating to him, and distinctly mitigates his reckless and wrongful charge of fraud against the other counsel. As to obtaining judgment against his own ignorant client without the latter's understanding knowledge of what was being done, there is nothing to be said in justification; that he did not actually enforce the judgment and perhaps never intended to, do not justify.

Several other errors are assigned besides those which involve the merits of the case and which we have discussed. It is not necessary to consider them in detail. We have examined these complaints, and we see no reason to think that there was any prejudicial error, or that the charges were not fairly tried, or that the finding of the court essentially rests upon anything not in the record.

We do not intend, by this opinion, any intimation that such an order as this can be set aside by writ of error in any case where there is evidence fairly tending to support the ultimate finding, or that the rule is different from that obtaining in ordinary trials before a United States District Judge without a jury. Mason v. Smith (C. C. A. 6) 191 Fed. 502, 112 C. C. A. 146. We have thought best in this case to consider the complaints more at large, but it need form no precedent in similar cases.

It is brought to our attention that, pending this writ of error, the Supreme Court of Ohio has readmitted Mr. Thatcher. That has no bearing here. If in due time an application is made in the District

Court for Mr. Thatcher's readmission, that court will give such force to the state court's action as may be thought proper.

The appeal is dismissed; and, on the writ of error, the order below is affirmed, without costs.