## MIRIAM WRIGHT *v.* HILO TRIBUNE-HERALD, LIMITED.

### No. 1879.

ARGUED OCTOBER 18, 1929.          DECIDED OCTOBER 23, 1929.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.

On December 9, 1928, the defendant corporation published in the Hilo Tribune-Herald, a newspaper owned by it, the following article:

"Mrs. Wright reported to have forsaken post when needed in Kona Hospital.

"Julian Yates tells Tribune-Herald that head of institution left one nurse to work all shifts with patients seriously ill.

---

"Forsaking her post at the Kona Hospital and leaving at least three patients in a serious condition with only one nurse and an inexperienced maid to run the entire hospital on 24-hour shifts, Mrs. Miriam Wright, resigning superintendent, came across the Island to Hilo yesterday on an unannounced 'vacation,' according to a report telephoned last night to the Tribune-Herald by Julian Yates, supervisor from Kona.

"Mrs. Wright is the nurse who's administration and social affairs were to be probed by the Hawaii Board of Supervisors had she not handed in her resignation to become effective not later than December 31.

"She was suspended by the supervisors pending the investigation that would have been held tomorrow afternoon, but upon receipt of her resignation because of ill health, the board revoked its suspension action.

" 'We are stranded in Kona for a nurse tonight,' Yates told the Tribune-Herald over the wire. 'Hilo is short of nurses. I can find none on the Island. So I have wired to Donald Bowman, head of the Hawaii Sugar Planters' Association welfare work in Honolulu, and asked that he find a nurse there and send her to the Kona Hospital by the next boat.

" 'Mrs. Wright took her "vacation" without notifying either myself or Chairman Samuel Spencer. She left no one to take her place. The entire burden of the Kona Hospital rests on Miss Irene Kono.

" 'Miss Kono can have no assistance until we can get another nurse. There are not many patients in the hospital, but three are in a grave condition.

" 'One maid left the hospital today. There is just one other there and she is inexperienced. This means that Miss Kono will have all responsibility for attending the patients.

■

" 'All I know of Mrs. Wright is that she has gone to Hilo. She told someone that she would be back next week.' "

The instant action, which is one of libel, is predicated on the publication of this article. The complaint contains no innuendoes, and only general damages are claimed. The only plea interposed by the defendant was a general denial of the truth of the allegations contained in the complaint. Upon the issues thus joined a jury was impaneled and the case proceeded to trial. The defendant admitted that it was the owner and publisher of the "Hilo Tribune-Herald" in which the article appeared. The paper containing this article was introduced and received in evidence. The plaintiff then testified in her own behalf. At the conclusion of her case the defendant, without offering any evidence, moved for a nonsuit on the following grounds: "(1) There is a fatal variance between the allegations of the complaint and the proof adduced in support thereof; (2) it affirmatively appears that the articles published and complained of are substantially true; (3) that it affirmatively appears that the article complained of is a privileged communication and there is no proof of malice; (4) that it affirmatively appears that the article complained of is not libellous; (5) that it affirmatively appears that the article is one of fair and reasonable comment upon matters of public importance." The motion was granted, the plaintiff excepted and now brings the case here for review on her exception.

We will first consider the second ground of the motion, namely, that it affirmatively appears that the article is substantially true. It is not denied, of course, that if it does so appear the motion was properly granted. It has too long been the law to be now questioned, that the truth of the matter contained in a publication is, in a civil suit for damages, a complete defense. (*Waterhouse* v.

*Spreckels,* 5 Haw. 246; *Gomes* v. *Hawaiian Gazette Co.,* 10 Haw. 108, 113.) "In the absence of statutory or constitutional provision to the contrary, the general rule is that in all civil actions of libel or slander, defendant is justified in law and exempt from all civil responsibility, where he alleges and establishes the truth of the matter charged as defamatory, whether the words are actionable per se or per quod, and notwithstanding the publication was malicious, or without reason on the part of defendant to believe the imputation to be true." 36 C. J. §193, pp. 1231-32.

In determining whether the truth of the article in the instant case was established we must look solely to the testimony of the plaintiff herself, that being the only testimony on the subject. In order to properly appraise this testimony we must consider it in connection with certain well established legal principles. At common law, if the truth of the matter published was relied on as a justification, it was necessary for the defendant to specially plead it. This is not the rule, however, in this Territory. Here the defense is available under a plea of the general issue. (*Gomes* v. *Hawaiian Gazette Co., supra.*) The sufficiency of the evidence relied on to establish the defense under a plea of the general issue must, however, be determined by the same rules as those by which the sufficiency of the special plea was determined under the common law. In other words, the evidence must be the same whether it is admitted under a special plea or the general issue. One of the rules governing the special plea is that it must be as broad as the defamatory charge made in the publication and a statement of facts showing the truth of a part only cannot operate as a complete defense. (37 C. J., §375, pp. 42-43.) Under this rule if one is guilty of publishing the whole of the alleged defamatory matter he cannot justify by showing that some part of it,

though divisible from the rest, was true. It is essential, therefore, in order to constitute a complete defense, that the evidence relied on establish the truth of the defamatory matter in its entirety and not that it establish only a part of it.

With these principles in mind we will compare the plaintiff's testimony with the publication and see whether the latter substantially proves the truth of the former.

The portions of the plaintiff's testimony which we conceive to be material to the question now under consideration are substantially as follows: On the date of the publication in question she was a registered professional nurse, having graduated from the Queen's Hospital in Honolulu in 1919. She remained as a nurse in this hospital until 1923, at which time she became the superintending nurse of the Kona Hospital, which was located at Kealakekua, South Kona, on the Island of Hawaii, and which was maintained by the County of Hawaii. She remained in this position until on or about December 12, 1928. During the year 1928 the regular staff of the hospital consisted of herself, Miss Kono, a registered nurse, three maids, a cook, a waiter, a yard man and two electricians. From the time she took charge of the hospital in 1923, up to the time her connection with it ceased, she was in entire control of its routine management, which included looking after the sick, matters of food, superintendence of the help, arranging week-end vacations, keeping the books and other things incidental to such an institution. When she took charge in 1923 she established a rule under which she and the assistant nurse should have alternate week-end vacations. These vacations, whether taken by herself or the assistant nurse, began on Saturday afternoon and continued until the following Monday morning. This rule continued in force during the entire time she was engaged at the hospital. The rule was known to Julian

Yates, one of the supervisors, and whose residence was in the district where the hospital was located, and was never objected to, so far as she knew, by him or any other member of the board. On one of her periodical vacations she went to Hilo with Mr. Yates. On another of these occasions she went to Hilo with Mrs. Yates, with Mr. Yates' knowledge and consent. On still another she went to Hilo, with Mr. Yates' consent, to have some dental work done. And on two others she went to Hilo without informing Mr. Yates and without obtaining his consent. She made two trips to Honolulu with Mr. Yates' consent. She made one trip to Waimea, which she did not think it necessary to report to Mr. Yates. Also, when she did not leave the Kona district on her vacations, and even when she did, she did not think it necessary to inform Mr. Yates unless there was something extra or out of the ordinary routine, in which event she felt it her duty to let Mr. Yates know because he was her superior in the management of the hospital. On December 8, 1928, when she went to Hilo, it was her turn to have a week-end vacation and she left the hospital about two o'clock in the afternoon intending to return on Monday. She did not inform Mr. Yates that she was going and he did not know that it was her turn, under the rule she had established, to have a vacation at that time. She did, however, tell Dr. Dickson, the resident physician, and Miss Kono, the assistant nurse, that she was going to Hilo and when she would return. She also told Dr. Dickson that she had arranged with Dr. Nakamuru, a dentist living in the district, to pour the anesthetic, if one was required during her absence. She had already told Dr. Nakamuru that she was going to Hilo and he had consented to go to the hospital if required. She also told Dr. Dickson that she would telephone to the hospital from Hilo on Sunday and if she was not needed she would remain in Hilo until

134

Monday. Miss Kono, the assistant nurse, had been on duty Friday night preceding the Saturday on which the plaintiff left for Hilo and during the plaintiff's absence it was necessary for her to remain on duty the remainder of that day, the following night, Sunday, Sunday night and Monday until the plaintiff's return, getting such sleep during this period as was consistent with her duties. On other occasions, when Miss Kono was absent, she (the plaintiff) had performed similar duties to those required of Miss Kono and during the same length of time, getting such sleep as she conveniently could. Only in exceptional cases would the nurse, left in charge while the other nurse took her week-end vacation, not have time to take her normal amount of sleep. When she (the plaintiff) left for Hilo she thought Miss Kono would be able to handle the work to be done at the hospital, otherwise she would not have gone. At the time she went to Hilo there were at the hospital, to assist Miss Kono, two maids who had been there since December 1. They were the kind of maids she usually had. Before leaving she tried to get in touch with another maid who had previously worked at the hospital, because she thought it better to have this maid in case Miss Kono should need her. She was unable, however, to find the maid but told Miss Kono to get her in case she needed her. Mrs. Schoening, who had previously been the housekeeper at the hospital, was no longer serving in that capacity. There were also at the hospital a cook, a waiter, a sort of second cook, a yard man and two electricians. There were as patients a Filipino upon whom an abdominal operation had been performed two or three days before and no serious symptoms had been made known to her—she did not know whether peritonitis had set in; a Japanese woman who was paralyzed on one side and who could ring the bell and speak; a diphtheria suspect who was in quarantine and who had

a severe sore throat and was under the observation of the doctor. He attended to his bodily needs, bathed himself and was not helpless; a week-old maternity case who wanted to go home on that day and had obtained the permission of the doctor to do so; a girl who had undergone a minor operation with local anesthetic for hemorrhoids and who went home on that afternoon; a two-year-old child who had suffered from convulsions, had been given an enema, was sleeping quietly and was taken home that afternoon, and a guest from the Kailua Inn who had come in that morning for compress applications to a boil and departed that afternoon. A patient critically ill was admitted to the hospital shortly after she left for Hilo and died during her absence. She did not remember whether Dr. Dickson had told her he was sending other patients to the hospital or not. Plaintiff had been suspended on Wednesday, December 5, and had sent in her resignation from the hospital on that date, giving poor health as her reason. Mr. Cody, when she was suspended, had discussed her trouble with her and advised her to resign on the ground of poor health, which, after consultation with her attorney, she did. She considered herself, however, still in the employ and service of the hospital, it being a rule of the nursing profession not to leave one's post until relief came. She had expected this relief on December 31. Numerous complaints against her had been filed with the board of supervisors and were investigated by the board. Most of these complaints were made by Japanese who had friends or relatives in the hospital and related entirely to some detail of her management of the institution.

It is quite obvious that not all of the statements contained in the publication were proven by the plaintiff's testimony. For instance, her testimony does not even tend to prove that Yates made the report that he is rep-

resented by the publication itself to have made or any report at all. This, however, may be passed as immaterial to the inquiry, involved in the ground of the motion for a nonsuit, we are now considering. It must be conceded that proof that Yates made the report would not justify its publication on the ground that it was true unless the statements contained in the report were in fact true. The real inquiry then is, Were the statements proven to be true?

Omitting the headlines, the first charge made against the plaintiff is as follows: "Forsaking her post at the Kona Hospital and leaving at least three patients in a serious condition with only one nurse and an inexperienced maid to run the entire hospital on 24-hour shifts, Mrs. Miriam Wright, resigning superintendent, came across the Island to Hilo yesterday on an unannounced 'vacation.'" The reasonable inference from this charge is that the plaintiff went away from the hospital under circumstances that constituted a culpable breach of her professional duty. Her testimony does not necessarily justify this inference. On the contrary, it tends to refute it. Also it tends to disprove the statements out of which the inference arises. According to her she went to Hilo on a week-end vacation, to which she was entitled under an established rule. She did not leave unannounced but told Miss Kono, her assistant nurse, and the house physician of her intention to go and neither of them objected or advised against it. She also told a neighboring dentist, who agreed to administer anesthetics if needed during her absence, and she informed the house physician of this arrangement. She did not leave one inexperienced maid to assist the nurse but two ordinarily capable maids and the usual domestic help. Nor does her testimony necessarily justify the charge that she left at least three patients in a serious condition. There had been six

patients in the hospital on the day she went to Hilo but two of them had gone home and another had been given permission to go. Of the three who were there when she left, one was a Filipino upon whom an abdominal operation had been performed two days before, another was a diphtheria suspect who was quarantined and whose throat was very sore but who was able to wait on himself. He was under the doctor's observation. And the third one was a Japanese woman who was partially paralyzed but who could speak and ring the bell. We cannot say from this testimony whether these patients, or any of them, were in a serious condition. The plaintiff testified that when she returned to her duties at the hospital on Monday morning they looked well cared for and all seemed satisfied and made no complaints. This would seem to indicate that they were not in a serious condition when she left.

The next charge against the plaintiff is as follows: "Mrs. Wright is the nurse who's administration and social affairs were to be probed by the Hawaii Board of Supervisors had she not handed in her resignation to become effective not later than December 31." The plaintiff's testimony establishes the truth of this charge so far as it relates to her "administration" of the hospital but it does not establish its truth so far as it relates to her "social affairs." There is no evidence that the social affairs of the plaintiff were to be probed by the board of supervisors and that the only reason this purpose had been abandoned was that she had handed in her resignation.

For the foregoing reasons we think the motion for a nonsuit should not have been sustained on the second ground.

The next ground of the motion for a nonsuit which we will consider is that "it affirmatively appears that the article complained of is a privileged communication and

138

there is no proof of malice." This ground, unlike the one we have just considered, is necessarily predicated upon the assumption that the statements published against the plaintiff were untrue and injurious. It is contended, however, that notwithstanding these qualities the plaintiff is remediless because the evidence shows that the statements were published in good faith and without actual malice and against a person who at the time held a public position, namely, superintending nurse of a county hospital. In other words, the defendant claims that the statements were privileged. We have no doubt that the plaintiff did belong to the class of public servants concerning whose official conduct a certain freedom of expression is allowed, whether exercised by newspapers or individuals. Assuming this, however, and also assuming, *but not deciding,* that the article before us was published in good faith and without actual malice, the question remains whether under the law governing privileged publications the ground of the motion under consideration was well taken. In discussing this question we must keep in mind that the portions of the publication which we have pointed out, and the truth of which we think was not established, purport to be statements of fact and are in no sense expressions of editorial opinion predicated upon proven or admitted facts. The specific question presented for decision is, therefore, whether the publication against a public servant of an untrue and defamatory statement of fact is privileged.

After listening to the carefully prepared and instructive arguments of counsel and after reading and considering many opinions of courts of high standing and after mature reflection we are firmly convinced that the publication in question does not belong to the class of publications which the law recognizes as privileged. A different conclusion would with great injustice expose public serv-

ants to a hazard against which other persons are protected, this hazard being the dissemination of defamatory falsehoods. The doctrine of privilege, we think, should not be extended so far. The true purpose of the law in granting this privilege, so far as it relates to public servants, is to give immunity to commentators upon, and critics of, proven or admitted official conduct and acts so long as their comments and criticisms, though unreasonable and harmful, are made in good faith and are not inspired by actual malice. This we believe to be the meaning of the often used and frequently misunderstood term, "freedom of the press," a freedom that does not belong exclusively to the press but to all persons. This freedom, or, more accurately, privilege, does not, however, extend to the publication or promulgation of statements that are mere fabrications and that are mischievous. In other words, it is the privilege of all persons, within certain bounds fixed by law, to criticize and even severely reproach public servants for their public acts but it is not the privilege of any one to calumniate them. By calumniate is meant to invent as well as publish an injurious charge.

Two American jurists conspicuous for their learning, and who are now members of the Supreme Court of the United States, have expressed themselves very clearly on this subject.

In *Post Pub. Co.* v. *Hallam,* 59 Fed. 530, the circuit court of appeals for the sixth circuit, speaking through Judge Taft, now Chief Justice of the Supreme Court of the United States, said (pp. 539, 540) : "Finally, we come to those assignments of error which are based on the charge of the court in regard to privileged communications. The court in effect told the jury that the article in question, relating, as it did, to a matter of public interest, came within a class of communications that were condi-

tionally privileged; that the public acts of public men (and candidates for office were public men) could be lawfully made the subject of comment and criticism, not only by the press, but also by all members of the public, for the press had no higher rights than the individual; but that while criticism and comment, however severe, if in good faith, were privileged, false allegations of fact, as, for instance, that the candidate had committed disgraceful acts, were not privileged, and that, if the charges were false, good faith and probable cause were no defense, though they might mitigate damages. Counsel for the plaintiff in error and the defendant below has argued with great vigor and an array of authorities that we ought not to adopt the view of the circuit court upon this important question, but should hold that the privilege extends to statements of fact as well as comment. * * * The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with

every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good."

It is true that the court was speaking of a defamatory falsehood published against a candidate for public office. The rule laid down, however, is on reason just as applicable to the incumbent of a public office. Certainly a public servant is within the pale of the law to the same extent as an aspirant for public service.

In *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, Mr. Justice Holmes (now Associate Justice of the Supreme Court of the United States) said (pp. 242, 243) : "We agree with the defendant, that the subject was of public interest, and that in connection with the administration of the custom-house the defendant would have a right to make fair comments on the conduct of private persons affecting that administration in the way alleged. But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case, a *bona fide* statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libellous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and

of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined as it generally is to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer."

In *Moore* v. *Booth Publishing Co.,* 216 Mich. 653, the supreme court of Michigan said (p. 656) : "While the interests of society require that immunity be granted to newspapers in the discussion of public questions and that fitting comment and criticism may be indulged in regarding the conduct of public officials, this privilege is limited and does not extend to protect against false statements, unjust inferences, or imputations of unworthy motives."

In *Putnam* v. *Browne,* 162 Wis. 524, the court said (p. 528) : "It is recognized that there is a disagreement in the authorities on the question whether false statements concerning candidates for office made without malice and in good faith are privileged. In some jurisdictions it is held that all matters, true or false, having a bearing on

the fitness of a candidate may be published without liability if it be shown that they were published without malice, in good faith, and in the honest belief that the facts stated were true. *Briggs* v. *Garrett,* 111 Pa. St. 404, 2 Atl. 513; *Coleman* v. *MacLennan,* 78 Kan. 711, 98 Pac. 281, 20 L. R. A. N. S. 361. We deem the other view, however, to be supported not only by our own decisions but by the better reason and by the great weight of authority in other courts. Newell, Slander & L. (3d ed.) §§633-636; 25 Cyc. 402-405 and notes; *Post P. Co.* v. *Hallam,* 59 Fed. 530."

Corpus Juris, Vol. 36, Sec. 289, p. 1283, contains the following statement of the prevailing rule: "The right to comment or criticize does not extend to, or justify, allegations of fact of a defamatory character. If the publication is not a comment or criticism, but a statement of fact, the rules to be applied to the nature of recovery are those applicable to any other case of defamation; if defamatory and false, it is actionable, although made in good faith, without malice, and under the honest belief that it is true. Probable cause for making it is not a factor to be considered in determining whether it is privileged or not. Where the accusation is defamatory, the damage does not result from the criticism based upon the facts but from the false accusation that the facts exist for which the criticism is made."

The numerous cases from different courts, cited in support of the text, indicate how strongly it is fortified.

We are aware that the rule we prefer to announce as the law in this jurisdiction is not the universal rule. There are cases which extend the privilege of criticism and comment upon facts to untrue statements of fact. These cases take the view that although statements that are untrue and injurious are published they are neverthe-

144

less not actionable if made in good faith and without actual malice.

At the argument our attention was called to three Federal cases which the defendant claims support this rule. In *Thatcher* v. *United States,* 212 Fed. 801, which was a proceeding to disbar an attorney for publicly defaming a judge who was also a candidate for re-election, the court said (p. 807) : "We cannot think that a lawyer citizen's criticism of such a candidate must needs be confined to what is 'decent and respectful.' His criticism may be as indecent and disrespectful as the facts justify. The rule governing such campaign utterances must be that of qualified privilege: Where expressions of opinion, they are permitted, if in good faith; and, where statements of fact, they may be made, if true, or in good faith and with reasonable cause believed to be true, but they are forbidden if the derogatory fact allegations are false, and are by the utterer known, or with ordinary care should be known, to be false. In this modified form, the rule is accepted in all jurisdictions. 18 Am. & Eng. Encyc. 1041, 1042. This court has adopted the stricter rule that good faith and probable cause will not make a falsehood privileged. *Post* v. *Hallam,* 59 Fed. 530, 539, 8 C. C. A. 201. While we see no reason for not applying here what was held in *Post* v. *Hallam,* we assume, for the purpose of this case, the more liberal criterion and say that, as this is found one way or the other, Mr. Thatcher must be justified or condemned." Out of this somewhat cryptic language there shines the following very clear and unmistakable statement: "This court has adopted the stricter rule that good faith and probable cause will not make a falsehood privileged. *Post* v. *Hallam,* 59 Fed. 530, 539, 8 C. C. A. 201." We found the opinion of Judge Taft in this latter case very persuasive and it seems apparent from what the court said in the *Thatcher* case that it did

not intend to change or modify the rule announced in *Post* v. *Hallam*.

In *National Cash Register Co.* v. *Salling,* 173 Fed. 22, Salling, the plaintiff, who had been in the employment of the defendant as a salesman, upon resigning his position, went to Los Angeles. The defendant learned that Salling was about to enter into the business of selling second-hand cash registers and thereupon issued to its agents throughout the United States and Canada a circular letter in which it laid some very heavy strictures upon Salling. Salling sued the defendant for damages, claiming that the statements made against him were libelous. The defendant pleaded privilege. Salling won before a jury in the lower court and the defendant took an appeal to the circuit court of appeals for the ninth circuit. In its opinion affirming the judgment of the lower court the court of appeals said (p. 27) : "Error is assigned to an instruction in which the court, after affirming the right of an employer to communicate with his employe upon any subject relating to the business in which they are mutually interested, and to communicate with a common employe with reference to the subject-matter of their common employment, said: 'If, however, such statement is known to the party communicating it to be false, such knowledge excludes the existence of good faith, and takes from the communication what otherwise would be its privileged character.' It is urged against this instruction that knowledge on the part of the author of the communication that it is false does not necessarily exclude the existence of good faith, nor take from the communication what otherwise would be its privileged character. To this we cannot assent. In order to the protection of a communication as qualifiedly privileged, it must appear that it was made in good faith, and in the honest belief that it was true. * * * And the question whether the

communication was made in good faith is one of fact for the jury."

The question before the court was whether, assuming that the communication issued by the defendant to its agents was privileged, the lower court correctly instructed the jury as to the effect upon the privilege of the defendant's knowledge of the falsity of the charges made against the plaintiff. It was to this question and to this alone that the observations of the court, above quoted, were directed. The question before us was not involved and therefore was not decided. Even the question whether the communication that was issued by the cash register company was privileged was not decided. The trial court had instructed the jury that it was privileged and the plaintiff had obtained a verdict notwithstanding. The character of the communication was therefore not involved in the appeal but only the effect of the defendant's knowledge of its falsity. For these reasons we think the case is not in point.

*New York & Porto Rico S. S. Co.* v. *Garcia,* 16 F. (2d) 734, is likewise not in point. The communication complained of was made by the ship's doctor to the plaintiff herself, in the presence of other persons who were bystanders. In an action brought by her against the steamship company for damages she recovered a judgment in the sum of $4900. On appeal by the defendant to the circuit court of appeals of the first circuit, the court held that the communication, having been made by the doctor in pursuance of his duty, was privileged and that it was error for the court below to instruct the jury that (p. 737) "it is universally held that in actions for defamation, when the words uttered are actionable *per se,* malice in law is conclusively presumed," assigning as its reason for reversing the lower court that when a communication is privileged the *prima facie* presumption or inference of

malice ordinarily attending the publication of defamatory words is overcome and the burden cast upon the plaintiff to establish malice in fact.

For the reasons already given we think the motion for a nonsuit should not have been granted on the ground that the publication was privileged. It must be understood, of course, that we are not deciding whether or to what extent good faith may be taken in mitigation of damages. That is altogether a different matter and is not involved in the case as it is now presented.

The other grounds of the motion were not specifically argued for the inferable reason that they were intended to raise the same questions that were argued and which we have considered.

The exception is sustained and a new trial is granted.

*D. E. Metzger* (*J. W. Russell* with him on the briefs) for plaintiff.

*E. H. Beebe* (*Thompson, Beebe & Winn* on the briefs) for defendant.